744 A.2d 754

**COMMONWEALTH of Pennsylvania, Appellee,**

v.

**Ferman McGEE, Appellant.**

Supreme Court of Pennsylvania.

Argued Nov. 16, 1999.

Decided Jan. 20, 2000.

David Crowley, Chief Public Defender, Public Defender's Office, for Ferman McGee.

Ray F. Griar, Dist. Atty., Mark S. Smith, 1st Asst. Dist. Atty., Lance T. Marshall, Asst. Dist. Atty., for the Com.

Before FLAHERTY, C.J., and ZAPPALA, CAPPY, CASTILLE, NIGRO, NEWMAN and SAYLOR, JJ.

## OPINION

SAYLOR, Justice.

We allowed appeal to consider whether constitutional double jeopardy principles barred a prisoner's criminal prosecution predicated upon misconduct for which he previously had been subjected to disciplinary confinement.

On September 25, 1996, prison officials conducted an administrative search of the person of Appellant Ferman McGee ("McGee"), an inmate at the State Correctional Institution at Rockview, during which they discovered an eyeglass stem, the tip of which could be removed to reveal a sharp wire. Pursuant to prison regulations, corrections authorities initiated administrative misconduct proceedings, charging McGee with infractions related to possession of a weapon and tampering with property. Following a hearing, a prison hearing examiner adjudged McGee guilty of the possession offense and imposed a disciplinary sanction of sixty days of "disciplinary custody consecutive," which entails, among other things, segregation from the general prison population in a restricted housing unit, as well as restrictions upon visitation and access to televisions, radios and telephones. McGee's subsequent administrative appeal was denied.

On December 6, 1996, the Pennsylvania State Police charged McGee with possession of a weapon or implement of escape under Section 5122(a)(2) of the Crimes Code, 18 Pa. C.S. § 5122(a)(2).[1] A district magistrate conducted a preliminary hearing and held McGee for court pursuant to Pennsylvania Rule of Criminal Procedure 143. McGee then filed an omnibus pre-trial motion in the trial court seeking the dismissal of the criminal charges on the ground that the double jeopardy clauses of the United States and Pennsylvania constitutions precluded such charges, as McGee had been subject to

---

1. McGee was initially charged with this offense on October 6, 1996; however, those charges were dismissed without prejudice following a preliminary hearing on November 27, 1996. The basis for such dismissal is not apparent from the record presented.

prison discipline for his conduct. The trial court denied the motion on the basis of its own prior holding that double jeopardy concerns are not implicated by prison disciplinary action, and the matter proceeded to a jury trial, at which McGee was found guilty. The trial court sentenced McGee to a term of twelve months' probation, to run concurrently with his pre-existing sentence.

On appeal, the Superior Court affirmed the judgment of sentence in a memorandum opinion. By reference to United States Supreme Court decisions articulating a framework for evaluating whether non-prison-related civil and administrative penalties equate with criminal sentences for double jeopardy purposes, as well as its own prior decisions specific to the prison disciplinary context, *see Commonwealth v. Bryant*, 346 Pa.Super. 475, 499 A.2d 1099 (1985); *Commonwealth v. Brooks*, 330 Pa.Super. 355, 479 A.2d 589 (1984), the Superior Court concluded that the sanction imposed on McGee was not in the nature of criminal punishment and thus did not preclude his subsequent prosecution. We granted allocatur to address the double jeopardy question in the prison disciplinary context.

■ The Double Jeopardy Clause of the United States Constitution provides that no "person [shall] be subject for the same offense to be twice in jeopardy of life or limb . . . ." U.S. CONST. amend V.[2] This proscription bars a second prosecution for the same offense after an acquittal or conviction, as well as multiple punishments for the same offense. *See McCane*, 517 Pa. at 499, 539 A.2d at 346 (citing *North Carolina v. Pearce*, 395 U.S. 711, 712, 89 S.Ct. 2072, 2076, 23 L.Ed.2d 656 (1969), *overruled in part on other grounds, Alabama v. Smith*, 490 U.S. 794, 802, 109 S.Ct. 2201, 2205, 104 L.Ed.2d 865 (1989)).

**2.** McGee's arguments before this Court are premised exclusively upon the Double Jeopardy Clause of the United States Constitution. Nevertheless, this Court has recognized that the corresponding proscription contained in the Pennsylvania Constitution, PA. CONST. art. 1, § 10, "involves the same meaning, purpose, and end," *Commonwealth v. McCane*, 517 Pa. 489, 500 n. 5, 539 A.2d 340, 346 n. 5 (1988); thus, it has generally been construed as coextensive with its federal counterpart.

Focusing upon the facet of double jeopardy jurisprudence protecting against multiple punishments, McGee maintains that, having been previously subjected to disciplinary sanction, he cannot be made to suffer again for the same conduct through formal criminal proceedings. Although McGee acknowledges that his position contradicts the Superior Court's long-standing precedent, he argues that such decisions are no longer valid in light of the United States Supreme Court's subsequent opinion in *Department of Revenue v. Kurth Ranch*, 511 U.S. 767, 114 S.Ct. 1937, 128 L.Ed.2d 767 (1994). The Commonwealth and *amicus curiae*, the Pennsylvania Department of Corrections and the Pennsylvania Prison Wardens Association, distinguish disciplinary sanctions from criminal punishment, emphasizing the civil, administrative nature of misconduct proceedings, as well as their essential role in the safe, orderly and effective management of correctional facilities.

The United States Supreme Court has made clear that not all forms of governmental sanctions or punishments implicate double jeopardy concerns; rather, it has determined that the Double Jeopardy Clause "protects only against the imposition of multiple *criminal* punishments for the same offense" occurring in successive proceedings. *Hudson v. United States*, 522 U.S. 93, 99, 118 S.Ct. 488, 493, 139 L.Ed.2d 450 (1997)(emphasis in original). Culminating with *Hudson*, the Court has issued a series of decisions outside the prison disciplinary setting establishing a framework for distinguishing such criminal punishments from civil or administrative sanctions, which, although capable of being described in common parlance as punishment, do not foreclose subsequent prosecutions. The construct entails evaluation of two primary criteria: 1) legislative intent, and, in particular, whether the legislative body intended the particular sanction to be civil or criminal in character, *see Hudson*, 522 U.S. at 99, 118 S.Ct. at 493 (stating that "[w]hether a particular punishment is criminal or civil is, at least initially, a matter of statutory construction"); and 2) the purpose and effect of the statutory scheme, specifically, the character and degree of its punitive aspects. *Id.* (requir-

ing that, if legislative intent is found to comport with a civil scheme, courts must " 'inquire[ ] further whether the statutory scheme was so punitive in purpose or effect' ... as to 'transfor[m] what was clearly intended as a civil remedy into a criminal penalty' " (citations omitted)). The Supreme Court also identified a series of additional factors that may provide "useful guideposts" for determining whether a sanction denominated as, or having some attributes of, a civil penalty should nevertheless be considered the equivalent of criminal punishment.[3]

Although the Supreme Court has not specifically addressed the applicability of double jeopardy principles to the prison misconduct setting, a multitude of federal and state courts have universally recognized that administrative discipline imposed by corrections authorities for infractions of prison regulations does not generally bar subsequent criminal prosecutions.[4] With respect to the initial determination of legislative

3. Those factors are as follows:
   (1) "[w]hether the sanction involves an affirmative disability or restraint"; (2) "whether it has historically been regarded as a punishment"; (3) "whether it comes into play only on a finding of *scienter* "; (4) "whether its operation will promote the traditional aims of punishment-retribution and deterrence"; (5) "whether the behavior to which it applies is already a crime"; (6) "whether an alternative purpose to which it may rationally be connected is assignable for it"; and (7) "whether it appears excessive in relation to the alternative purpose assigned."
   *Hudson,* 522 U.S. at 99–100, 118 S.Ct. at 493 (quoting *Kennedy v. Mendoza–Martinez,* 372 U.S. 144, 168–69, 83 S.Ct. 554, 567–68, 9 L.Ed.2d 644 (1963)).

4. While many of these decisions precede *Hudson* and therefore apply constructs containing some marginal variances, *see, e.g., United States v. Reyes,* 87 F.3d 676 (5 th Cir.1996); *United States v. Galan,* 82 F.3d 639 (5 th Cir.1996), *cert. denied,* 519 U.S. 867, 117 S.Ct. 179, 136 L.Ed.2d 119 (1996); *United States v. Brown,* 59 F.3d 102 (9 th Cir.1995); *United States v. Hernandez–Fundora,* 58 F.3d 802 (2d Cir.1995); *Garrity v. Fiedler,* 41 F.3d 1150 (7 th Cir.1994), *cert. denied,* 514 U.S. 1044, 115 S.Ct. 1420, 131 L.Ed.2d 303 (1995); *Lucero v. Gunter,* 17 F.3d 1347 (10 th Cir.1994); *United States v. Newby,* 11 F.3d 1143 (3d Cir.1993), *cert. denied,* 511 U.S. 1087, 114 S.Ct. 1841, 128 L.Ed.2d 468 (1994); *People v. Vasquez,* 89 N.Y.2d 521, 655 N.Y.S.2d 870, 678 N.E.2d 482, *cert. denied,* 522 U.S. 846, 118 S.Ct. 131, 139 L.Ed.2d 80 (1997); *Commonwealth v. Forte,* 423 Mass. 672, 671 N.E.2d 1218 (1996); *State v. Harlin,* 260 Kan. 881, 925 P.2d 1149 (1996); *State v. O'Connor,* 681

purpose pursuant to *Hudson*, all jurisdictions have found, expressly or impliedly, that such proceedings are intended to be of a civil/administrative nature. *See, e.g., Mayes*, 158 F.3d at 1223; *Vasquez*, 655 N.Y.S.2d 870, 678 N.E.2d at 488 (collecting cases). Where the legislative body has not specifically expressed such an intent, courts often infer it from the vesting of disciplinary authority in an administrative body, as well as the administrative structure and scope of systems for imposing discipline. *See Hudson*, 522 U.S. at 103, 118 S.Ct. at 495 ("[t]hat such authority was conferred upon administrative agencies is prima facie evidence that Congress intended to provide for a civil sanction"); *see also Mayes*, 158 F.3d at 1223.

In examining the second primary *Hudson* criterion (the purpose and effect of the statutory scheme), courts have characterized the objective of prison discipline as non-criminal and remedial in nature, emphasizing its central role in the maintenance of safety, discipline and order in the prison setting. *See Newby*, 11 F.3d at 1145–46 (describing the government's remedial goal as "to encourage good conduct and to maintain order in the prison, given that the prison is a place where good order and discipline are paramount because of the concentration of convicted criminals"); *see also Brown*, 59 F.3d at 105; *Hernandez–Fundora*, 58 F.3d at 807; *Vasquez*, 655 N.Y.S.2d 870, 678 N.E.2d at 488 ("[t]hat such rules are necessary to the safe, orderly and effective functioning of prisons seems to us so fundamental as to require no further elaboration"); *Brooks*, 330 Pa.Super. at 360–61, 363–65, 479 A.2d at 592, 594. While the substantial punitive attributes of misconduct-related sanctions are candidly recognized, such characteristics are viewed as subordinate to their essential central objectives. *See Hernandez–Fundora*, 58 F.3d at 806–07 ("[p]unitive interests and remedial interests ... are no-

A.2d 475 (Me.1996), others post-date *Hudson* and have either applied its analysis squarely or wholly reconciled it with reasoning unique to prison disciplinary sanctions. *See United States v. Mayes*, 158 F.3d 1215 (11th Cir.1998), *cert. denied sub nom.*, 525 U.S. 1185, 119 S.Ct. 1130, 143 L.Ed.2d 123 (1999); *Russo v. New Jersey Dept. of Corrections*, 324 N.J.Super. 576, 737 A.2d 183 (1999); *People v. Jones*, 301 Ill. App.3d 608, 234 Ill.Dec. 894, 703 N.E.2d 994 (1998).

where so tightly intertwined as in the prison setting, where the government's remedial interest is to maintain order and to prevent violent altercations among a population of criminals" and where "remedial concerns require 'punishing' individuals for violent or other disruptive conduct"); *see also Mayes,* 158 F.3d at 1224; *Vasquez,* 655 N.Y.S.2d 870, 678 N.E.2d at 486. *See generally Hudson,* 522 U.S. at 102 n. 6, 118 S.Ct. at 495 n. 6 ("the presence of a deterrent purpose or effect is not dispositive of the double jeopardy question"). Indeed, many jurisdictions have emphasized that misconduct sanctions are within a predictable range of punishment imposed for the criminal conduct for which the prisoner was originally sentenced and, although often changing the conditions of incarceration, do not go so far as to extend the period of imprisonment. *See Mayes,* 158 F.3d at 1224 ("[p]rison officials have no authority to alter the inmates' original criminal sentences[;][t]hey merely implement disciplinary proceedings that may, at most, change the conditions of the inmates' confinement for purposes of maintaining institutional order and encouraging compliance with prison rules"); *Brown,* 59 F.3d at 104; *Vasquez,* 655 N.Y.S.2d 870, 678 N.E.2d at 488; *Forte,* 671 N.E.2d at 1219–20; *Brooks,* 330 Pa.Super. at 362, 479 A.2d at 593.

Courts have also factored into the analysis the importance of affording some flexibility and deference to corrections authorities in establishing the terms of discipline, *see, e.g., Mayes,* 158 F.3d at 1224; *Newby,* 11 F.3d at 1146; *Garrity,* 41 F.3d at 1153; *Vasquez,* 655 N.Y.S.2d 870, 678 N.E.2d at 488; *Forte,* 671 N.E.2d at 1220, and have expressed the view that double jeopardy should not be imposed in a manner that would inhibit safe, orderly management. *See Mayes,* 158 F.3d at 1224; *Newby,* 11 F.3d at 1146; *Brooks,* 330 Pa.Super. at 365, 479 A.2d at 594–95. Additionally, they have frequently couched their analyses in terms of other, practical considerations unique to the prison environment and setting. *See Meeks v. McBride,* 81 F.3d 717, 722 (7th Cir.1996) (stating that " 'disciplinary proceedings take place in a highly charged atmosphere [where prison officials] must often act swiftly on

the basis of evidence that might be insufficient in less exigent circumstances'" (citation omitted)); *Brown*, 59 F.3d at 104 ("as a practical matter applying the prohibition against double jeopardy to prison disciplinary proceedings would effectively compel the government to choose between remedial and punitive goals"); *Russo*, 737 A.2d at 187 ("[p]risons are dangerous places, and the courts must afford appropriate deference and flexibility to administrators trying to manage this volatile environment"); *see also Vasquez*, 655 N.Y.S.2d 870, 678 N.E.2d at 488. Finally, specific application of the "guidepost" factors identified in *Hudson* is not always viewed as necessary or appropriate to the prison disciplinary context. *See Mayes*, 158 F.3d at 1224; *Jones*, 234 Ill.Dec. 894, 703 N.E.2d at 996–97.

■ Having considered the reasoning employed by our Superior Court as well as in other jurisdictions, we now join in the collective assessment. Applying the first primary *Hudson* criterion, it is clear from the structure and function of the administrative scheme for prison discipline that the Pennsylvania General Assembly intended it to be civil and administrative in nature. The legislative delegation of authority to administer, manage and supervise prison facilities to the Department of Corrections, *see* 71 P.S. § 310–1, constitutes *prima facie* evidence of such intent. Moreover, pursuant to such delegation, the Department has specifically incorporated remedial objectives into its policies, which state that "[a] consistently applied system of sanctions in response to inmate violations of Department of Corrections rules and regulations is established to ensure the safe and orderly operation of institutions and Community Corrections Facilities." Pennsylvania Department of Corrections, Policy Statement, Administrative Directive 801 (May 20, 1994). As to the second primary *Hudson* criterion, we afford deference to the Department's articulation and implementation of the purposes for prison discipline, and, while acknowledging the punitive aspects, conclude that the essential civil/remedial emphasis upon safe, orderly and efficient management, predominates. *See generally Small v. Horn*, 554 Pa. 600, 609, 722 A.2d 664,

669 (1998)(recognizing the substantial interest in the enforcement of reasonable rules of internal prison management to ensure public safety and prison security).[5] We also note that the disciplinary consequences at issue can fairly be viewed as a foreseeable contingency of the original sentence. *See generally Sandin v. Conner,* 515 U.S. 472, 485, 115 S.Ct. 2293, 2301, 132 L.Ed.2d 418 (1995) (stating that "[d]iscipline by prison officials in response to a wide range of misconduct falls within the expected perimeters of the sentence imposed by a court of law"). Further, we find it unnecessary to frame our evaluation in the prison setting according to the "guidepost" factors identified in *Hudson.*[6]

█ Thus, we hold that where, as here, prison disciplinary action is imposed for infractions of prison regulations within the confines of the authorized administrative scheme, and such discipline falls within the range of predictable punishment under the original sentence and can be justified on the basis of safe, orderly or efficient institutional administration, it does not implicate the constitutional proscription against subse-

**5.** We find particularly apt the following elaboration by the New York Court of Appeals:

Prisoners, by virtue of their status (resulting from a prior violation of the Penal Law) are subject not only to criminal laws, aimed at vindicating societal interests, but also to a whole array of internal prison rules and regulations, which serve the separate, legitimate and important institutional purposes of preserving prison order and safety. A prisoner who commits a crime in prison breaks both sets of rules, and may thus be sanctioned both internally to carry out the goals of the penal institution, and through criminal prosecution to vindicate public justice, so long as the disciplinary sanction does not stray so far beyond the bounds of the separate State interest in maintaining prison order and safety that the sanction can only be viewed as constituting criminal punishment.

*Vasquez,* 655 N.Y.S.2d 870, 678 N.E.2d at 486.

**6.** McGee's argument that our disposition is controlled by the United States Supreme Court's decision in *Kurth Ranch,* 511 U.S. at 767, 114 S.Ct. at 1937, is premised solely upon the holding in that case that administrative sanctions implicate double jeopardy protections if they are criminal in nature. While the general legal proposition for which *Kurth Ranch* is cited is correct, as discussed above, McGee's argument fails on the basis of our holding that his administrative punishment was not in the nature of a criminal sanction.

quent criminal prosecution based upon double jeopardy.[7]

Accordingly, the order of the Superior Court is affirmed.

---

**7.** *Cf. Hernandez–Fundora,* 58 F.3d at 807 (stating that "subsequent prosecutions will be barred only in those exceedingly rare circumstances where the disciplinary sanction imposed is grossly disproportionate to the government's interest in maintaining prison order and discipline"). There is no credible suggestion here that the sanction of restrictive confinement for sixty days imposed upon McGee for a weapons violation is grossly disproportionate either to his offense or to the remedial purposes of the system of prison discipline.