J-S65003-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| JOHN MINCH | |
| Appellant | No. 1626 WDA 2014 |

Appeal from the Judgment of Sentence February 13, 2014
In the Court of Common Pleas of Allegheny County
Criminal Division at No(s): CP-02-CR-0008111-2009

BEFORE:  LAZARUS, J., OLSON, J., and PLATT, J.[*]

MEMORANDUM BY LAZARUS, J.:                **FILED OCTOBER 12, 2016**

John Minch appeals from the judgment of sentence entered on February 13, 2014, in the Court of Common Pleas of Allegheny County. After careful review, we affirm.

On November 15, 2013, Minch was convicted of murdering his ex-wife, Melissa Groot.  At the time of her murder, on May 6, 1999, Melissa was living with her second husband, David Groot, and their baby, Gavin, in Bethel Park, Pennsylvania.  Minch's daughter with Melissa, Caitlan, was in the custody of Melissa's parents, Mary and Frank Michael.

On the morning of Melissa's murder, Melissa called her father, Frank Michael, to tell him that she received a hang-up phone call.  Melissa had

_____

[*] Retired Senior Judge assigned to the Superior Court.

plans to have lunch with Frank and Caitlan later that day. Frank tried to reassure Melissa that someone may have dialed a wrong number and that she should lock her doors.

Detective Terry Hediger testified that the Groot residence received a call at 8:32 a.m. from a pay phone on South Park Road, a couple of blocks away from the Groot home. Detective Hediger also testified that Officer Frank Marks and his partner located surveillance footage from a security camera positioned outside a bank on South Park Road, right next door to the gas station where the call was made to the Groot residence. The footage recovered from the bank's security camera revealed a vehicle that matched the physical description of the 1970 Chevrolet Blazer that Minch was seen driving on the morning of Melissa's murder. During Officer Marks' interview with Minch, Minch was unable to provide a witness to verify his whereabouts on the morning of May 6, 1999.

David Groot, Melissa's husband, left for work at around 8:20 a.m. on the morning of May 6. David was working temporarily as an IT professional at Centimark in Southpointe, Canonsburg. Mr. John Anthony Bowman, David's supervisor at the temporary agency, hand-delivered David his check sometime between 8:30 a.m. and 9:00 a.m. Mr. Todd Porterfield, David's supervisor at Centimark, testified that he saw David sometime after 9:00 a.m.

Frank picked Caitlan up from preschool at around 11:30 a.m. or 11:45 a.m. and drove to Melissa's house. Frank rang Melissa's doorbell a couple of

times but there was no answer. Frank took Caitlan out to lunch and went home. David also tried to call Melissa around 9:30 a.m. to get a phone number he left at the house. When Melissa did not answer the phone, David tried calling Melissa several more times throughout the day.

David left work at around 4:00 p.m. and upon arriving home, he discovered Melissa lying in the bathtub with her nightgown on, pale, not moving, with blue lips, and a pool of blood on the bathmat. Dr. Karl Williams testified that an autopsy revealed that Melissa's carotid artery was completely severed, with two major incised sharp edge wounds across her windpipe and cutting across the larynx. The autopsy also revealed a long, deep wound to Melissa's abdomen and liver, completely severing her aorta. Either the wound to the neck or the wound to the abdomen would have caused Melissa's death. There were also numerous defensive wounds located primarily on Melissa's left hand. The manner of death was ruled a homicide.

Detective Hediger testified that he interviewed Minch on May 18, 1999, at the homicide office in the City of Pittsburgh. Minch stated to Detective Hediger that he did not know where Melissa and his daughter Caitlan were living, and that he had never been to Melissa's house. Minch provided Detective Hediger with paperwork indicating that Melissa requested her home address be removed from court documents.

The Commonwealth also presented forensic evidence linking Minch to the murder of Melissa Groot. Pamela Woods microscopically examined hairs

recovered from Melissa's hands and nightgown in June 2007. One of the hairs recovered from the victim's hand had a root that Woods believed was suitable for nuclear DNA testing. Woods sent the fourteen unknown questioned hairs, including the hair from the victim's hand, for additional testing to Dr. Terri Melton at Mitotyping Technologies. Dr. Melton, the Commonwealth's expert, testified that the laboratory performed "...DNA extraction, PCR amplification and DNA sequencing on each of those 14 unknown questioned hairs." N.T. Trial, 11/12/13, at 678.

There was not enough nuclear DNA, however, to extract from the hair and form a profile. The mitochondrial DNA testing revealed that one hair in the victim's hand could have come from the victim, one hair in the victim's hand could have come from Minch, eight hairs from the nightgown could have come from David Groot, and four hairs from the nightgown were unsourced. Minch and his maternal relatives could not be excluded as possible contributors of the hair found on Melissa's hand. At trial, "[t]he Commonwealth's expert testified that, statistically, the mitochondrial DNA profile that was determined to be Mr. Minch's or that of his maternal relatives would be expected in one-third of one percent of all North Americans of any race." N.T. Trial, 11/12/13, at 686.

The Commonwealth also presented evidence of the strained relationship between Minch and Melissa Groot. Detective Hediger testified that when he questioned Minch, he asked if Minch had ever been violent with Melissa. Minch responded that he had never hit her. The Commonwealth

presented the trial court with medical records, subsequently admitted into evidence, that Melissa Groot sought medical treatment in 1996 for a swollen nose because Minch hit her. Bryan Schrecengost, a case worker with Children Youth Services (CYS), testified that CYS first became involved with Minch after allegations were made that Minch abused Caitlan when she was three or four years old. Schrecengost also testified that, "I remember specifically one incident when [Minch] was very agitated and he told me that he was going to kill [Melissa]." N.T. Trial, 11/8/13 at 523.

Richard Lauffer, Charles Volk, and Sean Ball, inmates incarcerated with Minch while Minch was awaiting trial, testified that Minch admitted to killing Melissa Groot. Richard Lauffer testified that he met Minch in prison and they spoke extensively about their charges. According to Lauffer, Minch said that "[He] killed her, and [he's] going to get away with it." N.T. Trial, 11/13/13, at 935. Charles Volk testified that "[Minch] told me that he used a knife; that it came from the kitchen counter. He told me she was – he left her in the bathtub. He has confessed over and over and over again." *Id.* at 947. Sean Ball, also a fellow inmate, testified that Minch told him he killed Melissa with a knife from the kitchen.

On March 31, 2009, Minch was charged with one count of first-degree murder and one count of burglary. 18 Pa.C.S.A. § 2501(a); 18 Pa.C.S.A. 3502(a)(1). On November 15, 2013, a jury found Minch guilty of both first-degree murder and burglary. On February 13, 2014, the court sentenced Minch to life in prison for the murder conviction, and to a concurrent term of

3 to 6 years' incarceration for the burglary conviction. Minch filed post-sentence motions, which were denied.

Minch filed a notice of appeal on October 3, 2014 and a concise statement of errors complained of on appeal on February 19, 2015. On September 21, 2015, the Honorable Phillip A. Ignelzi filed a Pa.R.A.P. 1925 opinion.

On appeal, Minch challenges the sufficiency and weight of the evidence presented at trial:

> 1. Whether the Appellant's First-Degree Murder and Residential Burglary convictions [should] be vacated with prejudice due to the Commonwealth's failure to present sufficient evidence of these crimes?
>
> 2. Whether the trial court abused its discretion when it denied Appellant's post-trial motion seeking a new trial owing to his convictions for First-Degree Murder and for Residential Burglary being against the weight of the evidence?

Appellant's Brief, at 3.

When reviewing whether evidence is sufficient to support a conviction beyond a reasonable doubt, we review the evidence received at trial in the light most favorable to the Commonwealth, as verdict winner. *Commonwealth v. Brown*, 52 A.3d 1139, 1164 (Pa. 2012). The ultimate question of evidentiary sufficiency centers around whether any "rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.*

- 6 -

To prove first-degree murder, the Commonwealth must prove that the appellant acted with malice and a specific intent to kill, that a human being was unlawfully killed, that the defendant committed the killing, and the killing was deliberate and premeditated. *Commonwealth v. Chamberlain*, 30 A.3d 381, 394 (Pa. 2011); 18 Pa.C.S.A. § 2502(a). Circumstantial evidence alone is sufficient to prove any or all of the elements of a criminal homicide. *Id.* Furthermore, "the facts and circumstances need not be absolutely incompatible with defendants' innocence, but the question of any doubt is for the jury unless the evidence [is] so weak and inconclusive that as a matter of law no probability of fact can be drawn from the combined circumstances." *Commonwealth v. Sullivan*, 371 A.2d 468, 478 (Pa. 1977) (citations omitted); *Commonwealth v. Libonati*, 31 A.2d 95, 97 (Pa. 1943).

Minch contends that the Commonwealth failed to present sufficient evidence to sustain his convictions for both first-degree murder and residential burglary, violating the due process clauses of Article I § 9 of the Pennsylvania Constitution and the Fourteenth Amendment of the United States Constitution. Specifically, Minch argues that the Commonwealth "failed to prove beyond a reasonable doubt the element of identity" with respect to the first-degree murder conviction. Appellant's Brief, at 19. Additionally, Minch argues that the evidence presented was insufficient to support his conviction for residential burglary because "the Commonwealth's proof was deficient in three ways—first, on the element of identity again;

- 7 -

second on the element of contemporaneous criminal intent; and third, on the element of unauthorized entry."[1] *Id.*

The Commonwealth presented sufficient evidence to sustain Minch's conviction for both first-degree murder and burglary. Firstly, the mitochondrial DNA testing of one of the hairs found on Melissa's hands could not exclude Minch as the hair's source. In addition to the forensic evidence, the Commonwealth presented footage recovered from a bank surveillance camera that places Minch's 1970 Chevrolet Blazer near Melissa's home and near the payphone where a hang-up phone call was placed to the Groot residence on the morning of the murder. The Commonwealth also presented the testimony of three inmates incarcerated with Minch while he was awaiting trial, and each inmate testified that Minch confessed to killing Melissa. Additionally, the Commonwealth presented evidence of the contentious relationship between Melissa and Minch, including Minch's past physical abuse of Melissa.

We are satisfied that based on the significant circumstantial evidence presented at trial, a rational trier of fact could have found the essential elements of both first-degree murder and burglary beyond a reasonable

---

[1] A person commits the offense of burglary if, with the intent to commit a crime therein, the person: (1) enters a building or occupied structure, or separately secured or occupied portion thereof that is adapted for overnight accommodations in which at the time of the offense any person is present. 18 Pa.C.S.A. § 3502(a)(1).

doubt. The Commonwealth presented substantial circumstantial evidence concerning Minch's identity and criminal intent. This Court has held on more than one occasion that circumstantial evidence may be sufficient to sustain the Commonwealth's burden of proof and that a positive identification of the assailant is not required. **See Commonwealth v. Whiteacre**, 878 A.2d 96 (Pa. Super. 2005); **Commonwealth v. Robertson**, 874 A.2d 1200 (Pa. Super. 2005). Therefore, we find that the Commonwealth's evidence was sufficient to sustain Minch's conviction for both first-degree murder and burglary.

Minch also challenges the weight of the Commonwealth's evidence. Appellate courts in Pennsylvania review a weight of evidence claim for an abuse of discretion.

> Appellate review of a weight claim is a review of the exercise of discretion, not of the underlying question of whether the verdict is against the weight of the evidence. Because the trial judge has had the opportunity to hear and see the evidence presented, an appellate court will give the gravest consideration to the findings and reasons advanced by the trial judge when reviewing a trial court's determination that the verdict is against the weight of the evidence.

**Commonwealth v. Clay**, 64 A.3d 1049, 1055 (Pa. 2013) (citing **Commonwealth v. Widmer**, 744 A.2d 754, 753 (Pa. 2000)).

> The term 'discretion' imports the exercise of judgment, wisdom and skill so as to reach a dispassionate conclusion within the framework of the law, and is not exercised for the purpose of giving effect to the will of the judge… Discretion is abused

where the course pursued represents not merely an error of judgment, but where the judgment is manifestly unreasonable or where the law is not applied or where the record shows that the action is a result of partiality, prejudice, bias or ill-will.

***Clay***, 64 A.3d at 1055; ***Widmer***, 744 A.2d at 322 (quoting ***Coker v. S.M. Flickinger Co***., 65 A.2d 1181, 1184-85 (Pa. 1993)).

The factfinder is free to believe all, part, or none of the evidence and to determine the credibility of the witnesses. The trial court will award a new trial only when the jury's verdict is so contrary to the evidence as to shock one's sense of justice. In determining whether this standard has been met, appellate review is limited to whether the trial judge's discretion was properly exercised, and relief will only be granted where the facts and inferences of record disclose a palpable abuse of discretion.

***Commonwealth v. Smith***, 985 A.2d 886, 897 (Pa. 2009) (citing ***Commonwealth v. Diggs***, 949 A.2d 873, 879 (Pa. 2008)).

Minch argues that the trial court abused its discretion when it denied his post-sentence motion seeking a new trial on the ground that his convictions were against the weight of the evidence. Appellant's Brief, at 52. We cannot conclude that the trial court abused its discretion when denying Minch's post-sentence motion. Although Minch maintains "certain facts are so clearly of greater weight that to ignore them or to give them equal weight with all the facts is to deny justice," he fails to identify which facts support his argument. ***See Thompson***, 493 A.2d at 673.

We agree with the Commonwealth's assertion that Minch has failed to explain how the court abused its discretion or demonstrate that the

- 10 -

Commonwealth's evidence was so fundamentally inconsistent, unreliable, or tenuous that it shocks one's sense of justice. **Smith**, **supra**. The trial court properly concluded "it was within the province of the jury to accept or reject the expert's testimony as probative of Minch's guilt, to assess the value of the photographs and phone records presented, and to determine the credibility of the witnesses." Trial Court Opinion, 9/21/15, at 49. Therefore, because the verdict rendered based on the evidence presented did not shock the trial court's sense of justice, we find no abuse of discretion. **Clay, supra.**

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 10/12/2016

- 11 -