**COMMONWEALTH of Pennsylvania**
**Appellee**

v.

**Randy Clark WHITACRE, Appellant.**

Superior Court of Pennsylvania.

Argued Sept. 29, 2004.

Filed June 16, 2005.

Thomas R. Ceraso, Greensburg, for appellant.

Michael Handler, Assistant District Attorney, Indiana, for Commonwealth, appellee.

Before: MUSMANNO, LALLY-GREEN, and McCAFFERY, JJ.

OPINION BY McCAFFERY, J.:

¶ 1 Appellant, Randy Clark Whitacre, appeals from a judgment of sentence imposed by the Honorable Gregory A. Olson, after a jury found Appellant guilty of first degree murder,[1] attempted criminal homicide,[2] aggravated assault,[3] recklessly endangering another person,[4] and burglary.[5] Appellant asks us to determine whether the trial court properly allowed testimony of a ballistics expert and whether it properly denied the motion for judgment of acquittal. We conclude that the trial court did not err in admitting the expert opinion testimony pertaining to ballistics and that the Commonwealth presented sufficient evidence to sustain the convictions. Accordingly, we affirm.

¶ 2 The relevant facts and procedural history, as summarized from the trial court opinion,[6] are as follows. On October 6, 2001, at approximately 1:30 a.m., an intruder kicked down the door of the residence of Douglas and Theresa Dalessio in Plumville, Indiana County. He proceeded upstairs where the Dalessio's and their two sons, Dylan and Devin, were asleep in their respective bedrooms. Theresa Dalessio left the bed she shared with her husband and went to the doorway between the room and the hall, where she was shot. Upon hearing the shot, Mr. Dalessio crawled under the bed and while there, he was able to use his cell phone to call 911.

In the meantime, the intruder walked down the hall and shot five-year old Dylan Dalessio, who was later found alive in the kitchen. While still under the bed, Mr. Dalessio heard a male voice demand, "Does anyone else want some of this?" Within minutes after the 911 call, state police arrived at the residence, but the intruder had already left. Dylan Dalessio survived and recovered from the shooting, but Mrs. Dalessio died as a result of her wounds. Following an investigation, police arrested Appellant and charged him with the above-cited offenses.

¶ 3 At trial, the Commonwealth presented testimony and other evidence which established that sometime in 1997, Appellant had purchased a home from Mr. Dalessio. Problems developed with the sewage system, and Appellant ultimately filed a lawsuit against Mr. Dalessio alleging misrepresentation. After a hearing on that lawsuit which occurred on October 4, 2001, the matter was continued with no resolution. Sometime after 10:20 p.m. on the following evening, October 5, 2001, Appellant was observed drinking at a bar. A few hours later, at approximately 1:00 a.m. on October 6, 2001, three volunteer firefighters observed a vehicle resembling Appellant's white pickup truck proceeding in a direction from his home towards the Dalessio residence. A short time later, the three firefighters observed the same pickup truck returning from the direction of the Dalessio residence going towards Appellant's home. Officers responding to the shooting at the Dalessio's residence, which occurred around 1:30 a.m., found one shotgun shell casing on the Dalessio's stairway. Seven months later, in March 2002, Mr.

1. 18 Pa.C.S.A. § 2501(a).

2. 18 Pa.C.S.A. §§ 901, 2501(a).

3. 18 Pa.C.S.A. § 2702(a)(1).

4. 18 Pa.C.S.A. § 2705.

5. 18 Pa.C.S.A. § 3502.

6. (Trial Court Opinion, dated May 30, 2003).

Dalessio found another shotgun shell casing in the drawer of a dresser that had been in his upstairs hallway on the night of the shooting. At trial, the Commonwealth's expert witness, Corporal Jack Wall, testified that he made a comparison analysis of these two shell casings with a shotgun owned by Appellant, which Appellant kept under lock and key, and that it was his opinion that the two shell casings had been discharged from Appellant's shotgun.

¶ 4 The jury found Appellant guilty of the above-cited offenses, and the court sentenced him to a mandatory life sentence plus an aggregated consecutive term of imprisonment of no less than twenty-four (24) and no more than fifty (50) years. Appellant timely appealed and raises the following two issues for our review:

A. DID THE [TRIAL] COURT ERR IN NOT GRANTING THE DEFENDANT'S MOTION FOR JUDGMENT OF ACQUITTAL AT THE CLOSE OF THE COMMONWEALTH'S CASE?

B. DID THE [TRIAL] COURT ERR IN PERMITTING THE TESTIMONY OF THE COMMONWEALTH'S FIREARMS EXPERT WHERE THE TESTIMONY PROVIDED WAS SUBJECTIVE RATHER THAN OBJECTIVE AND THUS VIOLATIVE OF THE FRYE STANDARD?

(Appellant's Brief at 4).[7]

■ ¶ 5 We first address Appellant's challenge to the sufficiency of the Commonwealth's evidence. Appellant argues that the court should have granted his motion for acquittal because the Commonwealth pursued two contradictory theories against him, and because there was no linkage of Appellant to the fingerprints and footprints found within the Dalessio residence after the shootings. (Appellant's brief at 18). We disagree.

■ ¶ 6 Our well-settled standard of review when evaluating a challenge to the sufficiency of the evidence mandates that we assess the evidence and all reasonable inferences drawn therefrom in the light most favorable to the verdict-winner, in this case the Commonwealth. *Commonwealth v. McHale*, 858 A.2d 1209, 1212 (Pa.Super.2004). If the fact-finder could have found that every element of the crime charged had been proven beyond a reasonable doubt, the evidence is *ipso facto* sufficient to sustain a conviction for that crime. *Commonwealth v. McCalman*, 795 A.2d 412, 415 (Pa.Super.2002), *appeal denied*, 571 Pa. 705, 812 A.2d 1228 (2002). As an *en banc* panel of this Court wrote in words destined to be reiterated:

The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. The facts and circumstances need not be absolutely incompatible with the defendant's innocence, but the question of any doubt is for the jury unless the evidence is so weak and inconclusive that, as a matter of law, no probability of fact can be drawn form the combined circumstances.

*Commonwealth v. Aguado*, 760 A.2d 1181, 1184–1185 (Pa.Super.2000) (*en banc*) (citations and quotations omitted). When passing on the credibility of witnesses and the weight of the evidence, the trier of fact is free to believe all, part or none of the evidence. *Commonwealth v. Passmore*, 857 A.2d 697, 706 (Pa.Super.2004) (citations omitted).

¶ 7 We determine that the Commonwealth's failure to match Appellant to the fingerprints and footprints found at the

7. We have reordered Appellant's issues for ease of disposition.

crime scene was not so significant as to eviscerate the evidence it did present such that the jury could not find Appellant guilty of all charges as a matter of law. Corporal Wall's unequivocal testimony identified the two shell casings found in the Dalessio residence as having been from a shotgun owned by Appellant. Three witnesses saw a white pickup truck resembling the one owned by Appellant in the vicinity of the Dalessio residence in the minutes both right before and right after the shootings. The timing, or "coincidence" of the shootings was another factor. Appellant was unhappy with the progress of his lawsuit against Mr. Dalessio and had suffered another legal setback the day before the shootings. Although the Commonwealth presented a case based on circumstantial evidence, such evidence may be, and in this case was, sufficient to sustain its burden of proof. *See Aguado, supra.*

¶ 8 Next, Appellant complains that the trial court erred in allowing an expert witness to testify regarding his opinion concerning ballistic evidence. Specifically, Appellant contends that the testimony of Corporal Jack Wall as to the origin of the spent shell casings found at the murder scene should have been excluded because it did not meet the minimum criteria required for expert opinion testimony, as required by application of the *Frye* [8] test under Pennsylvania law. (Appellant's brief at 8–16). We disagree.

¶ 9 Initially, we observe that the admission of evidence is reserved to the sound discretion of the trial court. *Commonwealth v. Dillon*, 863 A.2d 597, 600 (Pa.Super.2004) (*en banc*). Our standard of review is whether the trial court abused its discretion in admitting challenged evidence. *Id.*

■■■■ ¶ 10 Under *Frye, novel* scientific evidence is admissible if the underlying methodology has general acceptance in the relevant scientific community. *Commonwealth v. Dengler*, 843 A.2d 1241, 1242 (Pa.Super.2004) (quoting *Grady v. Frito-Lay, Inc.*, 576 Pa. 546, 554, 839 A.2d 1038, 1043–44 (2003)). It is the novel nature of the scientific evidence in question which triggers the applicability of the *Frye* test. *Dengler, supra* at 1243 (emphasis in original). "Not every scientific opinion is either new or original—some are the kind that are offered all the time." *Id.*

■■■ ¶ 11 Under *Frye*, the proponent of the evidence must prove that the methodology an expert used is generally accepted by scientists in the relevant field as a method for arriving at the conclusion the expert will proffer at trial. *Grady, supra,* at 1045. There is no corollary need for proof that the scientific community has also generally accepted the expert's specific conclusion. *Id.; Dengler, supra* (citing *Trach v. Fellin*, 817 A.2d 1102, 1112 (Pa.Super.2003) (*en banc*)).

¶ 12 Instantly, the trial court held a hearing, outside the presence of the jury, to determine the admissibility of the ballistic evidence which the Commonwealth sought to introduce. The evidence at issue was in the form of an expert opinion concerning the source of the two spent shotgun casings which had been recovered from the crime scene. Corporal Wall, a firearm and toolmark examiner employed by the Pennsylvania State Police, testified as to his qualifications and to the general acceptance of his methodology by the relevant scientific community. (Notes of Testimony ("N.T.") Trial, 1/9/03, at 5–8, 14–22). Corporal Wall described the manner of determination of whether a particular

8. *Frye v. United States,* 293 F. 1013 (D.C.Cir.    1923).

shot shell was discharged from a particular shotgun as follows:

> [W]hat we do in the State Police Crime Laboratory is to record details about the firearm on a worksheet and also details about the shot shell and then we take the firearm and we discharge it. And what we are doing when we discharge it is we are obtaining tests. That is, discharge shot shells that we know were discharged within that particular firearm because we discharged them within that firearm ourselves or they were discharged from that firearm by me. Then we go to an instrument called a comparison microscope which is a fancy name for a very simple idea[:] two microscopes sit side by side that are joined together by an optical bridge. In the center is a set of eye pieces. On one side of the microscope we put the shot shell that we know was discharged within that particular shotgun because we discharged it within that particular shotgun. On the other side of the microscope we put the questioned shot shell or the shot shell we are wondering whether or not that shot shell was discharged within that particular firearm or not. Looking at the comparison microscope there is a dividing line down the center and you can see two fields of view at the same time and again one side is the test side and the other side is the questioned shot shell. What we are looking for are similarities that appear both on the evidence shot shell and the test shot shell. If I can find enough similarities that occur both on the evidence shot shell and on the test shot shell I will come to a conclusion as to whether or not the two shot shells had a common source, that is whether or not they were discharged within the same shotgun. And basically that is what we do in the examination of

discharged shot shells or cartridge cases to a questioned firearm.

N.T. Trial, 1/9/03, at (14–16).

¶ 13 The comparison microscope examination method has been in use since the 1930's and is an accepted methodology by the Association of Firearms and Toolmark Examiners. (*Id.* at 16–17). Laboratories which use this method of analysis include those at the FBI, the Bureau of Alcohol, Tobacco and Firearms, the Washington, D.C. Metropolitan Police Department, the Philadelphia Police Department, and the New Jersey State Police, and "basically every crime laboratory in the United States that is doing firearms identification work...." (*Id.* at 17). In direct response to questioning by the trial court regarding the reliability of the comparison microscope technique, Corporal Wall stated that it is tested every day "in crime laboratories throughout the United States and throughout the world and it is accepted science and has been accepted for years and years." (*Id.* at 35).

¶ 14 As the technique has been in use since the 1930's, it is neither new nor original, but rather is of the sort that is offered all the time. *See Dengler, supra* at 1243. The trial court determined that the methodology employed by Corporal Wall was generally accepted by the scientific community consisting of firearms experts and by a number of significant governmental bodies within and without the Commonwealth of Pennsylvania. (N.T., 1/9/03, at 41). Because this conclusion is fully supported by the record, we find no abuse of discretion in the trial court's decision to permit admission of the evidence regarding comparison of the two shell casings with the shotgun owned by Appellant. *See id.*[9] We conclude that the trial court prop-

---

9. While disavowing employment of the analysis used by federal courts under the strictures

erly admitted the testimony of Corporal Wall regarding the comparison of the two shells found at the crime scene and the shotgun owned by Appellant. Thus, Appellant's claim fails.

¶ 15 Based upon the foregoing reasoning, we conclude that the trial court properly admitted the testimony of the Commonwealth's firearms expert and properly denied Appellant's motion for judgment of acquittal. Therefore, we affirm Appellant's judgment of sentence.

¶ 16 Judgment of sentence affirmed.

of *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), Appellant nonetheless urges this Court to adopt the criteria applicable under *Daubert* as part of the *Frye* test. We agree with the trial court's and the Commonwealth's characterization of Appellant's argument on this issue, *i.e.,* that he is attempting to graft onto the *Frye* criteria additional standards that are not part of the *Frye* analysis. Since our Supreme Court has determined that *Frye,* and not *Daubert,* provides the appropriate approach to the admission of novel expert testimony in this Commonwealth, we decline to adopt Appellant's approach. There is no requirement that there be objective standards for a determination that the comparison is in fact accurate. What is required is that the methodology employed be generally accepted by the relevant scientific community, even if it is heavily dependent upon the subjective judgment of the expert. *See Dengler, supra.*