J-S22040-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| RICHARD WAYNE SCHOCK | : | |
| | : | |
| Appellant | : | No. 1396 MDA 2020 |

Appeal from the Judgment of Sentence Entered August 26, 2020
In the Court of Common Pleas of York County Criminal Division at No(s):
CP-67-CR-0006658-2017

BEFORE:  PANELLA, P.J., McCAFFERY, J., and PELLEGRINI, J.[*]

MEMORANDUM BY PELLEGRINI, J.:                **FILED SEPTEMBER 22, 2021**

Richard Wayne Schock (Schock) appeals from the judgment of sentence of 16½ to 33 years' imprisonment imposed by the Court of Common Pleas of York County (trial court) after a jury found him guilty of drug delivery resulting in death, conspiracy to commit drug delivery resulting in death, and delivery of a controlled substance.[1]  On appeal, Schock raises challenges to the sufficiency and the weight of the evidence for all his convictions.  After review, we affirm his convictions for drug delivery resulting in death and delivery of a controlled substance but reverse his conspiracy conviction.  Because our

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] 18 Pa.C.S. §§ 2506(a), 903(a), and 35 P.S. § 780-113(a)(30), respectively.

disposition upsets the trial court's sentencing scheme, we vacate the judgment of sentence and remand for resentencing.

**I.**

In the early morning hours of February 18, 2017, 34-year-old Brandon Orr (Orr) was found dead in the basement bedroom of his parents' house. On a nearby dresser, the police found a piece of paper containing a tan powdery substance suspected of being heroin or fentanyl, leading police to conclude that Orr had died of a drug overdose. The cause of death was later determined to be mixed substance toxicity, with the toxicology report confirming that Orr had elevated levels of fentanyl in his blood.

Police quickly determined where Orr got the fentanyl by searching his cell phone. That search revealed several text messages the night before between Orr and one of his friends, Jennings "Junior" Perrine (Perrine). Earlier in the evening, Perrine texted Orr about wanting heroin but not having any money. Orr, who had just been paid that day at his job, also wanted heroin and asked Perrine "who has it," meaning drugs. Perrine texted back "the farm," referring to where Schock lived with his girlfriend, Tammy Kidd (Kidd); Perrine knew Schock had heroin because he ran into Kidd that afternoon and learned that Schock was in Baltimore getting heroin.

Orr texted Schock and asked: "Hey did [Junior] text you? It's cool if we stop over?" When Schock did not respond, Orr called Schock's cell phone and spoke to him. Not long after, Perrine picked up Orr at his house and drove

him to Schock's property. Schock was waiting for them when they arrived. Orr got out of the car and handed Schock a $100 bill, and Schock handed him six bags of what they thought was heroin. After getting back in the car, Orr snorted one of the bags and gave another to Perrine. Perrine then drove Orr back home. The next morning, Orr's father discovered that Orr's bedroom door was wedged shut. After getting no response, he kicked the door open and found Orr.

In September 2017, Schock was arrested and charged with delivery of a controlled substance, drug delivery resulting in death, and involuntary manslaughter. Schock later entered a plea but withdrew it, following which he proceeded to a January 2019 jury trial that ended in a mistrial because the jury could not reach a verdict. Schock's second trial was held in July 2020. Just before trial, the Commonwealth amended its information to add one count of conspiracy to commit drug delivery resulting in death, though the information did not identify a co-conspirator. At the end of trial, the jury found Schock guilty of drug delivery resulting in death, conspiracy and delivery of a controlled substance. He was sentenced to 8½ to 16 years for drug delivery resulting in death and a consecutive 8 to 16 years for conspiracy, giving him an aggregate sentence of 16½ to 33 years' imprisonment.[2]

_____

[2] The trial court imposed no sentence for delivery of a controlled substance because it merged with drug delivery resulting in death.

Orr filed post-sentence motions challenging the sufficiency and weight of the evidence. After those motions were denied, Schock filed this appeal.[3] On appeal, he raises two issues for our review:

> I. Whether the jury verdict of guilty as to criminal conspiracy to commit drug delivery resulting in death, possession with intent to deliver and drug delivery resulting in death was against the greater weight of the evidence.

> II. Whether the evidence was insufficient to support the jury's verdict as to conspiracy to commit drug dealing resulting in death, possession with intent to deliver and drug delivery resulting in death.

Schock's Brief at 4.

## II.

## A.

Because of our disposition, we will first address Schock's drug delivery resulting in death and delivery of a controlled substance convictions, beginning with his sufficiency challenges to those offenses.[4]

---

[3] Schock's notice of appeal purported to appeal from both the judgment of sentence and the denial of his post-sentence motions. In criminal matters, however, an appeal properly lies from the imposition of the judgment of sentence. *See Commonwealth v. Shamberger*, 788 A.2d 408, 410 n.2 (Pa. Super. 2001) (*en banc*) (citation omitted).

[4] Our standard of review for the sufficiency of the evidence is as follows:

> [w]hether viewing all of the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying the above test, we may not weigh the evidence and substitute our judgment for the fact-finder. In

Drug delivery resulting in death is defined as follows:

> **(a) Offense defined.--**A person commits a felony of the first degree if the person intentionally administers, dispenses, delivers, gives, prescribes, sells or distributes any controlled substance or counterfeit controlled substance in violation of ... The Controlled Substance, Drug, Device and Cosmetic Act, and another person dies as a result of using the substance.

18 Pa.C.S. § 2506(a). The offense "consists of two principal elements: (i) intentionally administering, dispensing, delivery, giving, prescribing, selling or distributing any controlled substance or counterfeit controlled substance and (ii) death caused by ("resulting from") the use of that drug." ***Commonwealth v. Kakhankham,*** 132 A.3d 986, 991-92 (Pa. Super. 2015) (footnote omitted).

Delivery of a controlled substance, meanwhile, is defined as follows:

> (a) The following acts and the causing thereof within the Commonwealth are hereby prohibited:

---

> addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the finder of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.

***Commonwealth v. Gause***, 164 A.3d 532, 540-41 (Pa. Super. 2017) (citations and quotation marks omitted).

- 5 -

* * *

> (30) Except as authorized by this act, the manufacture, delivery, or possession with intent to manufacture or deliver, a controlled substance by a person not registered under this act, or a practitioner not registered or licensed by the appropriate State board, or knowingly creating, delivering or possessing with intent to deliver, a counterfeit controlled substance.

35 P.S. § 780–113(a)(30).

The Commonwealth presented sufficient evidence that Schock delivered a controlled substance to Orr. At trial, Perrine testified that he picked up Orr at his house and drove him to Schock's property. *See* N.T., 7/14/20, at 156-160. After they arrived, Perrine described seeing Schock hand Orr six bags of what they believed to be heroin:

> Q: [W]hen [Orr] got out of the car, did you see him do anything?
>
> A: Yeah, [Orr] walked up. I was close enough to see – when he walked up to [Schock], I seen him hand [Schock] the hundred dollar bill. And I [saw Schock] give him six things.
>
> Q: When you say six –
>
> A: The heroin.

*Id*. at 160.

Additionally, the lead investigator, Trooper Michael Penrose (Trooper Penrose), testified that he found two folded pieces of paper in Orr's bedroom, one of which contained a tan powdery substance that he recognized as likely being either heroin or fentanyl. *Id*. at 252-54. That substance was later tested and confirmed to be fentanyl, a schedule II-controlled substance. *Id*.

at 238.[5]   Viewing the evidence in the light most favorable to the Commonwealth as the verdict winner, there was sufficient evidence for the jury to conclude that Schock delivered to Orr the fentanyl that was found in his bedroom the next morning.  Thus, the Commonwealth adduced sufficient evidence to establish the offense of delivery of a controlled substance, which is the first element of drug delivery resulting in death.

We likewise find that there was sufficient evidence that the fentanyl caused Orr's death, which is the second element of drug delivery resulting in death.  Section 2506 "requires a 'but-for' test of causation." **Kakhankham**, 132 A.3d at 993.  As a result, we have recognized that a defendant's "conduct need not be the only cause of the victim's death in order to establish a causal connection" and that "[c]riminal responsibility may be properly assessed against an individual whose conduct was a direct and substantial factor in producing the death even though other factors combined with that conduct to achieve the result." **Id**. at 993 n.8.

Dr. Barbara Bollinger, the forensic pathologist who did the autopsy, testified that Orr's cause of death was mixed substance toxicity, with the primary cause of death being the fentanyl.  **See** N.T., 7/14/20, at 221-23.  Schock implied on cross-examination that the fentanyl was not the cause of

---

[5] Schock stipulated to the drug identification report finding that the substance was fentanyl.  **See** N.T., 7/14/20, at 237-38.

death, but Dr. Bollinger reiterated her conclusion on redirect when asked about the elevated levels of fentanyl in Orr's blood:

> Q: The level of fentanyl in Mr. Orr's blood, the 16.8 nanograms per milliliter, that would be above the therapeutic level?
>
> A: Yes, that is a supratherapeutic level.
>
> Q: And that level of fentanyl in his blood was a substantial cause of his death?
>
> A: Yes.

*Id*. at 226.

This established the second element for drug delivery resulting in death, as Dr. Bollinger opined that Orr's use of the fentanyl—which Schock delivered—was a substantial factor in causing Orr's death. As a result, the Commonwealth presented sufficient evidence to convict Schock of drug delivery resulting in death. *See Commonwealth v. Burton*, 234 A.3d 824, 833 (Pa. Super. 2020) (finding sufficient for drug delivery resulting in death where defendant intentionally delivered fentanyl that caused the victim's death); *Commonwealth v. Storey*, 167 A.3d 750, 758 (Pa. Super. 2017) (same).

**B.**

We also conclude that the trial court did not abuse its discretion in denying Schock's post-sentence motions challenging the weight of the

evidence for his drug delivery resulting in death and delivery of a controlled substance convictions.[6]

Schock forwards several arguments for why the greater weight of the evidence supported finding that he delivered the fentanyl to Orr. Among these, Schock assails the credibility of Perrine, portraying him as an unreliable witness who lied to the police to avoid being charged and then lied again at trial in the hopes of receiving consideration for two pending criminal cases.

Schock asserts the same for a witness named Jeffrey Witmer (Witmer). As discussed more below, Witmer befriended Schock while the two were in jail, gaining his trust to the point that Schock admitted to him that he gave Orr the drugs that ultimately caused his death. Like Perrine, Schock argues that Witmer came forward to get his bail lowered on a pending DUI case. Schock adds that Witmer admitted at trial that in exchange for testifying, he expected consideration on his two pending criminal cases.

As both arguments attack the witnesses' credibility, we are mindful of the following:

_____

[6] When evaluating a challenge to the weight of the evidence to support a conviction, this court does not reweigh the evidence presented at trial, but rather evaluates the trial court's denial of the motion for a new trial for an abuse of discretion. An abuse of discretion occurs "where the course pursued represents not merely an error of judgment, but where the judgment is manifestly unreasonable or where the law is not applied or where the record shows that the action is a result of partiality, prejudice, bias or ill-will." *Commonwealth v. Clay*, 64 A.3d 1049, 1054-55 (Pa. 2013) (citation omitted).

When the challenge to the weight of the evidence is predicated on the credibility of trial testimony, our review of the trial court's decision is extremely limited. Generally, unless the evidence is so unreliable and/or contradictory as to make any verdict based thereon pure conjecture, these types of claims are not cognizable on appellate review.

***Commonwealth v. Akrie***, 159 A.3d 982, 989-90 (Pa. Super. 2017) (citation omitted).

First, Perrine's testimony about what happened was corroborated by Orr's cell phone records. At trial, Perrine testified that he was "hurting real bad" and wanted heroin. ***See*** N.T., 7/14/20, at 150. Perrine knew that Schock had heroin because he ran into Kidd earlier that day and she let him know that Schock was getting heroin in Baltimore. ***Id***. at 152-54. Perrine, however, was not allowed to go to "the farm" because Schock and Kidd did not like him. ***Id***. at 149-50. Orr, however, was friends with Schock and was allowed to go to "the farm," which is why Perrine texted him. ***Id***. at 154. As a result, Orr called Schock and made the arrangements for them to go to "the farm" to get what they thought was heroin. ***Id***. at 155.

To corroborate this, the Commonwealth admitted the text messages between Perrine and Orr. These text messages matched Perrine's testimony, showing that Orr asked Perrine "who has something," with Perrine replying, "the farm." ***Id***. at 265. Orr then sent a text to "Richard" in his cell phone contacts, which Trooper Penrose later confirmed was Schock. ***Id***. at 280. After receiving no reply, Orr called Schock at 10:05 p.m. and had an 11-minute conversation, following which Schock called him back at 10:17 for a

5-minute conversation. *Id*. at 281. As a result, despite Schock's credibility complaints, Perrine's testimony was substantiated by Orr's cell phone records.

As for Witmer, while he admitted hoping for consideration for his testimony, he also testified that he had not been promised anything. *Id*. at 193-94. He also disputed that he came forward with his information in order to get his bail lowered on a pending DUI case. According to Witmer, his bail was lowered because he was accepted into DUI court, not because he gave information about Schock. *Id*. at 208-09.

A jury is free to believe all, part or none of the evidence when passing on the credibility of the witnesses and the weight of the evidence. *See Commonwealth v. Whitacre*, 878 A.2d 96, 99 (Pa. Super. 2005). Here, the jury was free to weigh the credibility concerns that Schock raised about Witmer against his explanations for coming forward. In making this determination, though, we note that Witmer's version largely matched that given by Perrine, and Witmer testified that he did not know anybody involved in the case before meeting Schock. *Id*. at 201. Schock did little to rebut how Witmer would have found out about the case unless Schock told him, as Witmer testified that he never reviewed Schock's discovery. *Id*. at 210. For these reasons, we do not find that Schock's credibility attacks on Witmer warrant relief.

Finally, besides attacking Perrine's and Witmer's credibility, Schock asserts a host of other reasons why the jury's verdict was against the weight of the evidence:

Relative to any evidence collected, for example the baggies containing fentanyl and/or heroin, there was no DNA or fingerprint evidence. [Schock] denied any involvement in Brandon Orr's death. The only thing [Schock] spoke to the victim about was doing drywall work, which was circumstantially confirmed by [Orr's boss, Richard Farrington], who talked to the victim about having a friend perform drywall work. The victim sent a text to a number linked to the [Schock], but there was no response. Commonwealth Witness Perrine did not go to the police of his own volition; he was picked up by them. Of note, Perrine was the initial suspect, and would have been facing a potential sentence of 20 to 40 years.

Schock's Brief at 14.

Putting aside the complaints about Perrine, which we discussed above, we find none of these reasons warrant relief. We will briefly address Schock's claim that his phone call with Orr was about drywall. During the investigation, Schock gave a statement in which he denied any involvement in Orr's overdose death. **See** N.T., 7/14/20, at 294. Schock, however, admitted that he spoke to Orr that night about drywall. **Id**. At trial, Orr's boss, Richard Farrington, testified that he spoke to Orr about a drywall issue on a house that they were working on, and that Orr mentioned about getting a friend from Maryland to help. **Id**. at 234-36.

Thus, Orr's boss confirmed only that they discussed one of Orr's friends helping with drywall. Aside from Schock's statement to Trooper Penrose, there is no evidence to prove that Schock was the friend that Orr suggested

- 12 -

to his boss. In any event, we fail to see how any of this disproves Perrine's testimony and the cell phone records that show him and Orr texting each other about getting heroin from "the farm" just before Orr called Schock. The jury was free to believe this evidence and credit it over Schock's claim that Orr called him to discuss drywall.

Accordingly, after review, we find that the trial court did not abuse its discretion in denying Schock's weight of the evidence challenges to his drug delivery resulting in death and delivery of a controlled substance convictions.

## III.

## A.

We now turn to whether Schock's conviction for conspiracy to commit drug delivery resulting in death was supported by sufficient evidence. Before doing so, we must address whether the co-conspirator was Perrine or Kidd. As noted, the Commonwealth did not add the conspiracy count until the start of Schock's July 2020 jury trial. In its amended information, the Commonwealth did not identify a co-conspirator. Instead, the Commonwealth waited until its closing statement to allege that Kidd was the alleged co-conspirator.

> Remember Richard [Schock] sits before you today facing four charges. One of which is conspiracy to drug delivery resulting in death. You heard from Junior Perrine who ran into Tammy. What did Tammy tell him[?] Richard went down to Maryland to get stuff. He'll be back later. Junior who has it. Brandon is looking for stuff. Tammy.

- 13 -

> Legally it doesn't matter whether Tammy set up the deal or Richard [Schock] set up the deal. If Tammy set it all up and didn't want to go out in the bad weather and sent Richard, then you can find Richard Shock guilty of conspiracy for drug delivery resulting in death, the delivery, and the drug delivery resulting in death.

N.T., 7/15/20, at 330-31.

At sentencing, Schock requested a concurrent sentence for conspiracy, arguing that there was no evidence of a conspiracy because no one else was charged with conspiracy. *See* N.T., 8/26/20, 23-24. The trial court, however, rejected this argument and imposed a consecutive 8 to 16 years for conspiracy. In doing so, the trial court thought that Perrine was the co-conspirator.

> In Count 4, criminal conspiracy drug delivery resulting in death -- you know, just because they didn't charge the co-conspirator -- they don't always charge a co-conspirator. If that person is the first person to tell the truth, that person gets the deal. In this case, the deal was, we're not going to charge you. So the fact that he wasn't charged doesn't mean there wasn't a conspiracy. In fact, the testimony revealed clearly that you and Junior [Perrine] were discussing this and Mr. Orr and Junior [Perrine] were discussing this. This is three people tied together for one purpose, and that's to make sure that drugs are sold. I am imposing a sentence of 8 to 16 years.

*Id*. at 29-30.

The trial court seemed to state the same in its Pa.R.A.P. 1925(a) opinion, finding there was sufficient evidence for the jury to conclude that Schock conspired to sell heroin or fentanyl to Orr, "as indicated by testimony from [Perrine] as well as cell phone records." Trial Court Opinion, 12/31/20, at 10.

- 14 -

On appeal, Schock reasserts that there was no evidence of any conspiracy between him and any other person, observing that Perrine himself admitted at trial that he never spoke to Schock about buying any drugs. **See** Schock's Brief at 19. While we do not agree with Schock's assertion that there was no evidence of a conspiracy, we agree that there was insufficient evidence that Perrine conspired with Schock to deliver drugs to Orr. At trial, Perrine testified that he never had any contact with Schock on February 17, 2017. **See** N.T., 7/14/20, at 169. That Perrine drove Orr to Schock's property to get the drugs does not mean that he agreed with Schock to engage in a criminal offense, namely, delivery of a controlled substance. Involvement is not the same thing as agreement, and there is no evidence that Schock and Perrine made any agreement.

Having found that Perrine could not be the co-conspirator, we turn to the Commonwealth's evidence on whether Schock conspired with Kidd to deliver the fentanyl to Orr.

**B.**

There were four main pieces of evidence at trial that arguably connected Kidd to Schock's delivery of the fentanyl to Orr. The first was Perrine's meeting with Kidd on February 17, 2017. Perrine testified that he ran into her at the store during the afternoon. **See** N.T., 7/14/20, at 152. From speaking to her, Perrine learned that Schock was getting heroin in Baltimore. **Id**. at 154. However, this was the extent of Perrine's testimony about the

- 15 -

interaction, as he did not testify that Kidd told him to contact her or Schock later that day about getting heroin.

Second, there were the text messages between Perrine and Orr. At trial, the Commonwealth admitted pictures of the text messages between Perrine and Orr leading up to the two going to Schock's property.[7] As noted above, Orr texted Perrine to ask, "who has it." *Id*. at 265. Perrine replied: "the farm." When Orr replied to ask if he meant someone else, Perrine texted back: "No tammy." *Id*. at 266. Orr then asked Perrine, "Have u talked to her? Can we stop over?" Perrine responded: "txt her their good ask her." Rather than text Kidd, though, Orr texted Schock to ask, "Hey did [Junior] text you? It's cool if we stop over?" *Id*. After receiving no response, Orr texted Perrine: "No response to text or call." *Id*. Perrine texted Orr back, "Yes their good what up," and then a few minutes later: "I talk to them abit ago on ph." *Id*.

Third, the Commonwealth asked Witmer about what he told him in jail about Kidd's involvement.

Q. …[W]hat did Richard Schock tell you about [Kidd] or her role in all of this?

A. Well, earlier in the day I guess – Brandon Orr passed away in the evening hours later. Earlier that day, [Kidd] was out and about and Junior Perrine, he was out running around. I don't know

_____

[7] Trooper Penrose also submitted the cell phone for forensic analysis, resulting in a Cellebrite report containing all the text messages from Orr's cell phone, as well as his incoming and outgoing phone calls. The Commonwealth admitted this report at trial.

what he was doing.   But they crossed paths at a gas station somewhere…

* * *

But they crossed paths.   They got to talking and from what [Schock] has always told me that – [Schock] doesn't like Perrine – Junior.   And [Kidd] really doesn't like him.   And – but they crossed paths, and I guess he came over and was talking to her, wanted to know – he was trying to purchase some heroin.

* * *

And she didn't have any.   And she knew that [Schock] was going down to Maryland to get some, and she just let him know that that's what he was doing.   So later in the day, [Perrine] then continually was texting, trying to get it and obtain heroin.

N.T., 7/14/20, at 198-99.

According to Witmer, Schock admitted that Kidd sometimes helped him deliver drugs and would have delivered the fentanyl to Orr if it had not been snowing the night of February 17, 2017.

Q. Okay.   So what did Richard Schock tell you about how the deal went down?   I know he didn't want [Perrine] at his house.   Did he tell you where the deal happened?

A. Yeah, [Perrine] was texting him, texting him, texting him, and he wasn't answering.   And I believe – and this is a long time ago, but then I believe [Orr] actually texted or called – called, that's what it is.   He called.   And [Orr] actually spoke with [Schock] on the phone, and he found out what he needed, and then I guess it was snowing and stuff.   And I guess there was times from what [Schock] told me that [Kidd] would also – because if [Schock] worked or whatever, he would leave some of his stuff there and, you know, she would do a deal, you know, things like that.

And – but she didn't like [Perrine].  **It was snowing, she didn't want to go out.**  And you know, [Schock] is friends – was friends with [Orr].   So he agreed to go down and went down to the bottom of the lane…

- 17 -

*Id*. at 201.

Fourth, and finally, Perrine testified that he found out about Orr's death on February 18, 2017, from a text message sent by Kidd.

Q. Okay. At some point, did you learn that [Orr] had died?

A. Yes. [Kidd] had text me and told me [Orr] had died, to please not say nothing.

Q. Okay. When was that?

A. The next morning.

*Id*. at 162.

The Commonwealth, however, did not admit any of Perrine's cell phone records, even though Trooper Penrose obtained his cell phone and had a forensic analysis performed. *Id*. at 298. Explaining why not, Trooper Penrose testified that the content of the report "was very limited," although he remembered that Schock sent a text message to Perrine reading "[s]omething along the lines of Brandon died, call now." *Id*.

**C.**

Having reviewed the evidence, we now turn to whether there was sufficient evidence to convict for conspiracy to commit drug delivery resulting in death. A person is guilty of criminal conspiracy "if with the intent of promoting or facilitating" the commission of a crime, the person

> (1) agrees with such other person or persons that they or one or more of them will engage in conduct which constitutes such crime or an attempt or solicitation to commit such crime; or

- 18 -

(2) agrees to aid such other person or persons in the planning or commission of such crime or of an attempt or solicitation to commit such crime.

18 Pa.C.S. § 903(a).

We have explained the following about criminal conspiracy:

A conviction for criminal conspiracy, 18 Pa.C.S.A. § 903, is sustained where the Commonwealth establishes that the defendant entered an agreement to commit or aid in an unlawful act with another person or persons with a shared criminal intent and an overt act was done in furtherance of the conspiracy.

The essence of a criminal conspiracy is the common understanding that a particular criminal objective is to be accomplished. Mere association with the perpetrators, mere presence at the scene, or mere knowledge of the crime is insufficient. Rather, the Commonwealth must prove that the defendant shared the criminal intent, *i.e.,* that the Appellant was "an active participant in the criminal enterprise and that he had knowledge of the conspiratorial agreement." The defendant does not need to commit the overt act; a co-conspirator may commit the overt act.

A conspiracy is almost always proven through circumstantial evidence. "The conduct of the parties and the circumstances surrounding their conduct may create 'a web of evidence' linking the accused to the alleged conspiracy beyond a reasonable doubt." The evidence must, however, "rise above mere suspicion or possibility of guilty collusion."

Among the circumstances which are relevant, but not sufficient by themselves, to prove a corrupt confederation are: (1) an association between alleged conspirators; (2) knowledge of the commission of the crime; (3) presence at the scene of the crime; and (4) in some situations, participation in the object of the conspiracy. The presence of such circumstances may furnish a web of evidence linking an accused to an alleged conspiracy beyond a reasonable doubt when viewed in conjunction with each other and in the context in which they occurred.

*Commonwealth v. Lambert*, 795 A.2d 1010, 1016 (Pa. Super. 2002) (*en banc*) (citations omitted).

Moreover, this Court has held that conspiracy to commit drug delivery resulting in death is a cognizable crime, even though the conspirator may not contemplate the death of the drug user. As we have explained:

…[W]hen conspiring to engage in certain conduct, conspirators need not contemplate the ultimate crime in order to be charged and convicted of conspiracy to commit that crime. In cases of conspiracy to commit third degree murder, even when death was not the objective of the conspirators, a conviction may be upheld where the conspirators planned to assault the victim and the victim ultimately dies as a result. Likewise, with regard to conspiracy to commit drug delivery resulting in death, a drug user's death need not be the objective of the conspirators because the consequence of an overdose is a foreseeable result of the delivery, distribution, or sale of drugs to the victim. In short, the conspiracy to commit an overt act binds the conspirators to the foreseeable consequences of the conduct. Here, the conspiring parties need not specifically anticipate the death of the user of the drug. A conspiracy to commit the overt act of an intentional drug delivery links the conspirators to the foreseeable consequence that the drug user may die.

*Commonwealth v. Carr*, 227 A.3d 11, 17-18 (Pa. Super. 2020).

After review, even viewing the evidence in the light most favorable to the Commonwealth as verdict winner, we find that the Commonwealth presented insufficient evidence that Schock agreed with Kidd to deliver a controlled substance to Orr.

First, while Kidd let Perrine know that Schock was getting heroin, there was no evidence that the two made any plans for Perrine (or anyone else for that matter) to buy some later that night. According to Witmer's testimony about what Schock told him, Perrine ran into Kidd at the store and "was trying to purchase heroin." N.T., 7/14/20, at 199. Kidd then let Perrine know that

- 20 -

Schock was in Baltimore getting heroin. *Id*. Beyond this, however, there is no evidence that Kidd and Perrine discussed either Perrine or Orr coming to Schock's property later that night and to buy heroin. In sum, Perrine merely found out that Schock was getting heroin; no plans were made for him or someone else to buy some later that night.

Second, there was no evidence that Perrine contacted Kidd after their meeting to see if he could purchase heroin. At trial, Perrine did not remember texting Kidd or Schock after seeing Kidd at the store. *Id*. at 179. Moreover, as noted, the Commonwealth obtained Perrine's cell phone and received a forensic analysis of the phone's contents but did not admit it at trial. *Id*. at 297-98. We note that while Orr was on a phone call to Schock, Perrine texted Orr, "I talk to them abit ago on ph," presumably meaning, "I talked to them a bit ago on phone." *Id*. at 266. However, besides there being no cell phone records to substantiate that Perrine called Kidd, the Commonwealth never asked Perrine at trial whether he called Kidd while he and Orr were texting each other about going to "the farm" to buy heroin.

Third, there was no evidence that Orr ever contacted Kidd about buying heroin. According to his cell phone records admitted at trial, Orr never texted or called Kidd leading up to him and Perrine going to buy the drugs. Instead, when Perrine texted Orr that they had heroin at "the farm," Orr texted Schock, "Hey, did [Junior] text you? It's cool if we stop over?" *Id*. at 279. Then, when he received no response, Orr placed an outgoing call to Schock's phone

that lasted 11 minutes, following which Orr received an incoming call from Schock's phone that lasted 5 minutes. *Id*. at 281-282. Neither Orr's text messages nor his call log show any communication with Kidd.

Fourth, with there being no evidence that either Perrine or Orr contacted Kidd to set up the delivery, the Commonwealth's conspiracy charge hinges on Witmer's testimony. As recounted above, Schock told him that Kidd made drug deliveries for him in the past when he could not, and that "[i]t was snowing, she didn't want to go out." *Id*. at 201. At most, this shows that Kidd knew that Schock was going to give Orr the fentanyl but she did not want to do it. This is not the same thing as proving that Kidd entered into an agreement with Schock to sell the fentanyl to Orr. Indeed, without evidence that Kidd participated in setting up the drug delivery, it is equally believable that Kidd did not learn about the drug delivery until after Orr and Schock spoke to each other on the phone.

The same is true about Kidd's text message to Perrine the next morning that Orr had died and to "not say nothing." While this may seem to show a consciousness of guilt, it could also merely show that Kidd knew Schock had delivered the fentanyl and did not want Perrine to implicate him. Again, that Kidd lived with Schock and knew about the drug delivery is not the same thing as her agreeing with him to sell fentanyl to Orr and helping set up the delivery.

As we noted above, mere knowledge of a crime or presence is insufficient to prove conspiracy. *See Lambert, supra*. Here, with no

evidence that Kidd helped set up the drug delivery, the Commonwealth's evidence proved only that Orr called Schock and made the arrangements for the delivery, and that Perrine drove Orr to Schock's property where he saw Schock hand them to Orr. Aside from letting Perrine know that Schock was getting heroin, there was no evidence that Kidd participated in either the setup or the execution of the drug delivery. In the absence of such evidence, we conclude that the Commonwealth did not offer sufficient evidence for the jury to convict Schock of conspiracy to commit drug delivery resulting in death. As a result, we reverse his conviction and judgment of sentence for that offense.

Because the trial court sentenced Schock to a consecutive 8 to 16 years' imprisonment for conspiracy, our vacation of that conviction upsets the trial court's sentencing scheme. Thus, Schock must be resentenced on the drug delivery resulting in death and delivery of a controlled substance convictions that we have affirmed. *See Commonwealth v. Lekka*, 210 A.3d 343, 358-59 (Pa. Super. 2019) (quoting *Commonwealth v. Benchoff*, 700 A.2d 1289, 1294 (Pa. Super. 1997)) ("[I]f we determine that a correction by this [C]ourt may upset the sentencing scheme envisioned by the [sentencing] court, the better practice is to remand.").

Convictions at count 1 (delivery of a controlled substance) and count 2 (drug delivery resulting in death) affirmed. Conviction at count 4 (criminal conspiracy to drug delivery resulting in death) vacated. Judgment of sentence vacated. Case remanded for resentencing. Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 9/22/2021